IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT L. HEDRICK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. A. No. 1:15-CV-00648-KBJ |
| | ) |
| UNITED STATES FEDERAL BUREAU OF | ) |
| INVESTIGATION, | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)    I am the Section Chief of the Record/Information Dissemination Section ("RIDS"),

Records Management Division ("RMD"), in Winchester, Virginia.  I have held this position since

August 1, 2002.  Prior to my joining the Federal Bureau of Investigation ("FBI"), from May 1,

2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law.  In

that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures,

appeals, and litigation for the Navy.  From October 1, 1980 to April 30, 2001, I served as a Navy

Judge Advocate at various commands and routinely worked with FOIA matters.  I am also an

attorney who has been licensed to practice law in the State of Texas since 1980.

(2)    In my official capacity as Section Chief of RIDS, I supervise approximately 219

employees who staff a total of ten (10) Federal Bureau of Investigation Headquarters ("FBIHQ")

units and two (2) field operational service center units whose collective mission is to effectively

plan, develop, direct, and manage responses to requests for access to FBI records and information

pursuant to the FOIA as amended by the OPEN Government Act of 2007 and the OPEN FOIA

Act of 2009; the Privacy Act of 1974; Executive Order 13,526; Presidential, Attorney General,

and FBI policies and procedures; judicial decisions; and Presidential and Congressional

directives. The statements contained in this declaration are based upon my personal knowledge,

upon information provided to me in my official capacity, and upon conclusions and

determinations reached and made in accordance therewith.

      (3)     Due to the nature of my official duties, I am familiar with the procedures followed

by the FBI in responding to plaintiff's request for information from its files pursuant to the

provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a.

Specifically, I am aware of the FBI's handling of plaintiff's FOIA/ Privacy Act ("FOIPA")

request to the Brownsville Resident Agency of the Texas FBI Field Office, seeking access to FBI

records relating to sixteen (16) inquiries for the time period of approximately "March 2010 to

Present"[1] including:

- records related to plaintiff's federal criminal case number 1:11-CR-00715-001, United States of America v. Robert L. Hedrick;
- all FBI case file numbers related to plaintiff and certain third party individuals for United States District Court, Southern District of Texas, Brownsville Division, case Doc. No. 1:12-CR-00506-001;
- all information (notes, reports, evaluations) related to plaintiff's case located at the Cameron County Sheriff's Department/FBI joint investigation, to include complaints filed by plaintiff against a third party individual, interview between plaintiff and two FBI field agents in August 2012, information regarding Dyna Corp in Ft. Worth, TX as it relates to this interview, all information regarding a Colombian known as "The Colonel" as it relates to this interview;
- any and all correspondence between any FBI agent or employee or contractor in relation to plaintiff and a certain Homeland Security Agent, several U.S. Attorney's, United States District Court Judge Andrew S. Hanen, and any employee of the United States Marshal Service;
- all information from an investigation by the FBI-South Texas Corruption Task Force as it relates to plaintiff, including records prepared by several FBI Special Agents;

---

[1] The search cutoff date is October 3, 2013. This is the date the FBI conducted the initial search for records in this case. *See* Exhibits A-B, plaintiff's August 20, 2013, and August 28, 2013, FOIA requests, which are separate, but very similar 16 part inquires.

- all information related to plaintiff at any level of the FBI.

(4)     In response to plaintiff's FOIPA request, the FBI processed a total of two responsive pages.  These two pages were released in part ("RIP").  In accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), this declaration is being submitted in support of defendant's motion to dismiss or in the alternative, for summary judgment in order to provide the Court and plaintiff with an explanation of the FBI's recordkeeping system; the procedures used to search for, review, and process the responsive records; and the FBI's justifications for withholding records in part pursuant to Privacy Act Exemption (j)(2) and FOIA Exemptions 6, and 7(C).  *See* 5 U.S.C. § 552a(j)(2), 5 U.S.C. §§ 552 (b)(6), and (b)(7)(C).

## BACKGROUND

(5)     Records responsive to plaintiff's request consist of a two page "302" Interview Form[2] compiled as a result of an interview by FBI Special Agents of plaintiff at his Brownsville, Texas, Pan American Airways, Inc., office on March 28, 2011.

(6)     Plaintiff is currently incarcerated for the following convictions related to criminal proceedings held in the United States District Court, Southern District of Texas, Case Number 1:11-CR-00715-001: Count 1, Attempted Sexual Exploitation of Children (18 U.S.C. § 2251(a) and (e)), Count 2, Transfer of Obscene Material to a Minor (18 U.S.C. § 1470)), Count 3-4, Distribution of Child Pornography (18 U.S.C. § 2251(A)(a)(2) and (b)), and Count 5, Possession of Child Pornography (18 U.S.C. § 2252A(a)(5)(B) and 2252A(b)(2)).  No FBI investigative records were compiled in relationship to these criminal investigations and convictions.  The responsive two page FD-302 Interview Form processed for release was compiled for an unrelated matter (*See* ¶ 5).

---

[2] An FD-302 Interview Form is an internal FBI form documenting interviews of individuals.  Such interview information may later be used to further investigations.

**ADMINISTRATIVE HISTORY OF PLAINTIFF'S FOIA REQUEST**

(7)     By letter dated August 20, 2013, plaintiff submitted a FOIPA request seeking

access to information relating to his federal criminal case number 1:11-CR-00715-001, <u>United</u>

<u>States of America v. Robert L. Hedrick</u>, and other inquires, for the period "March 2010 to

present," including:

> *1. Surveillance & arrest reports;*
> *2. Investigatory notes, reports & recordss[sic];*
> *3. Tape-recorded statements and/or conversations (phone, and/or in-person);*
> *4. Any and all witness statements (written, typed, and/or tape-recorded or on any computer media);*
> *5. Reports of evidentiary and/or scientific information findings, and conclusions[sic];*
> *6. Any and all hand-written versions of anything in 1-5 above;*
> *7. Video tapes and/or photographs;*
> *8. Computer disks and/or computerized note pad disks;*
> *9. All other information, data, and/or reports not otherwise exempt by law;*
> *10. A list of all of the FBI Investigation case file numbers related to Robert Lynn Hedrick, [three third party individuals named] (U.S. District Court, Southern District of Texas, Brownsville Division, Docket No. 1:12CR00506-001); All information related to Hedrick's case located at Cameron County Sheriff's Department/FBI joint investigations; [third party individual named]; Cameron County Sheriff's Department Corrections Officer (investigation of the complaints filed by Hedrick against [third party individual named];*
> *11. Notes, reports, evaluations (hand-written versions included) and all materials listed above as they apply to an interview between Robert Lynn Hedrick and two FBI field Agents, held at Cameron County Sheriff's Department in Olmito, Texas on or about August 20, 2012;*
> *12. All information listed above regarding Dyna Corp in Ft. Worth, Texas as it relates to Hedrick's interview in August, 2012 with the Agents listed in 11. above;*
> *13. All information listed above regarding a Colombian known as "The Colonel" as it relates to Hedrick's interview in August, 2012 and his case;*
> *14. Any and all correspondence between and FBI agent or employee or contractor; in relation to Hedrick with:*
>> *a. Homeland Security Agent [third party individual named];*
>> *b. U.S. Assistant United States Attorney [third party individual named];*
>> *c. U.S. Assistant United States Attorney [third party individual named];*
>> *d. United States Attorney Kenneth Magidson;*
>> *e. United States District Court Judge Andrew S. Hanen;*
>> *f. Any employee of the United States Marshal's Service.*
> *15. All of the information in 1-14 above contained in or a part of an Investigation by the FBI-South Texas Correction[sic] Task Force.  And in specific all of the*

4

*information in 1-14 above in the possession of or prepared by FBI Agents [third party individual named] (Internal Affairs); [third party individual named] and any other agent regarding the complaint filed by Robert Hedrick and [third party individual named] concerning threats made by Brownsville City Commissioner; [third party individual named] against Hedrick's TSA Homeland Security Cargo Screening Facility: World-Wide Consolidated Logistics-Cargo Management Division located at the Brownsville South Padre Island International Airport.*

*16. Any and all information related to Robert Lynn Hedrick at any level of the FBI.*

In addition, plaintiff requested a "'Fee Waiver' provision pursuant to 28 C.F.R. §

16.11(d)." (*See* **Exhibit A.**)

(8)     By letter dated August 28, 2013, plaintiff submitted another FOIPA request

seeking access to additional information relating to his federal criminal case number 1:11-CR-

00715-001, <u>United States of America v. Robert L. Hedrick</u>, and his other inquires, for the period

"January 1, 2010 to Present," including:

> *1. All information located anywhere within the Federal Bureau of Investigation; at any office, including, but not limited to the following offices:*
> *A. FBI, 2305 Hudson Blvd., Brownsville, TX 78526;*
> *B. Any other Brownsville offices;*
> *C. FBI-South Texas Corruption Task Force (at any location) specifically at offices in Brownsville, San Antonio and Corpus Christi, Texas;*
> *D. Houston, Texas;*
> *E. Sacramento, California;*
> *F. Sanfranciso[sic], California;*
> *G. Headquarters Washington DC;*
> *2. Survellance[sic] & arrest reports;*
> *3. Investigatory notes, reports & records;*
> *4. Tape-recorded statements and/or conversations (phone and/or in-person);*
> *5. Any and all witness statements (written, typed and/or tape recorded or on any computer media;*
> *6. Reports of evidentiary and/or scientific information, findings, and conclusions;*
> *7. Video tapes and/or photographs;*
> *8. Any and all hand-written versions of items in 1-6 above;*
> *9. Computer disks and/or computerized note pad disks;*
> *10. All other information, data, and/or reports not otherwise exempt by law;*
> *11. A list of all of the FBI investigation case file numbers related to Robert Lynn Hedrick, [three third party individuals named] (USDC, SD TX, Brownsville Division; Docket No. 1:12CR00506-001). All information related to Hedrick or Hedrick's case located at Cameron County Sheriff's Department (CID) in Olmito, Texas where Hedrick met with two FBI Agents regarding threats to Hedrick by*

*Cameron County Sheriff's Department Corrections Officer [three third party individual named]. Also regarding the smuggling of weapons grade plutonium from the Balkins*[sic] *through Bogota Colombia through Hedrick's TSA Homeland Security Cargo Screening Facility located at Brownsville South Padre Island International Airport by [third party individual named], a person known in Columbia (with ties to Dyna Corps in Ft. Worth, Texas) and two Russians (one in Ft. Lauderdale and one in Miami); both representing the Anatov Aircraft in North and South America;*

*12. Notes, reports, evaluations (hand-written versions included) and all materials listed above as they apply to the two agents who met with Hedrick in 11 above;*

*13. All information listed above regarding Dyna Corp and "The Colonel" who is the person in Colombia listed in 11 above;*

*14. Any and all correspondence of any type, including, but not limited to hand-written notes, letters, emails, faxes or other computer generated correspondence to the following:*

> *A. Homeland Security Agent [third party individual named];*
> *B. Assistant United States Attorney [third party individual named];*
> *C. Assistant United Sates Attorney [third party individual named];*
> *D. United States Attorney Kenneth Magidson;*
> *E. United States District Court Judge Andrew S. Hanen;*
> *F. Any employee of the US Marshal Service;*
> *G. Any other state or federal employees;*
> *H. Any other investigation agency (foreign or domestic).*

*15. All of the information in 1-14 above contained in or a part of an investigation by the FBI-South Texas Corruption Task Force. In specific, all of the information in 1-14 above in the possession of or prepared by FBI Agents [third party individual named] (internal affairs); [two third party individuasl named] or any other FBI employee regarding the complaint filed on or about April 16, 2011 by [third party individual named] and Robert Hedrick concerning threats made by Brownsville City Commissioner; [two third party individuals named] (Fly Frontera) against Hedrick's TSA Homeland Security Cargo Screening Facility: World-Wide Consolidate Logistics-Cargo Management Division located at Brownsville South Padre Island International Airport;*

*16. Any and all information, at any FBI offices, concerning Robert Lynn Hedrick.*

In addition, plaintiff requested a "Vaughn" index, itemizing each item withheld, the

exemptions claimed for each item, and the reasons for why the exemption applies to that item.

Plaintiff again requested a "'Fee Waiver' provision pursuant to 28 C.F.R. § 16.11(d)." **(See**

**Exhibit B.)**

(9)   In a letter dated September 16, 2013, the FBI acknowledged receipt of plaintiff's

requests and assigned it FOIPA Request number 1228440-000.[3]  The FBI advised plaintiff his

request did not contain enough information to conduct an accurate search of the Central Records

System.  The FBI enclosed a Certification of Identity form for plaintiff to fill out and sign under

perjury statement attesting to his identity, and instructed plaintiff to return it within 30 days from

the date of the letter, or his request would be closed.  Finally, plaintiff was informed of his right to

appeal FBI's determination to the Director, Office of Information Policy ("OIP"), U.S.

Department of Justice, within sixty (60) days from the date of the letter.  *(See* **Exhibit C.)**

(10)   By letter dated September 23, 2013, plaintiff returned the signed Certificate of

Identity form with the requested additional personal identifiers in order for the FBI to conduct an

accurate search.  *(See* **Exhibit D.)**

(11)   In a letter dated October 3, 2013, the FBI acknowledged receipt of plaintiff's now

perfected FOIPA request.  The FBI informed plaintiff it would search the FBI's Central Records

System indices for information responsive to his request; his request for a fee waiver would be

considered at a later date; and he could check the status of his request at www.fbi.gov/foia.  *(See*

**Exhibit E.)**

(12)   In a letter dated October 8, 2013, the FBI informed plaintiff no main file records

responsive to his FOIPA request were located during a search of the Central Records System.

The FBI advised plaintiff to provide additional information if he wanted a further search

conducted.  In addition, his fee waiver request was unnecessary to adjudicate, since no responsive

main files were located.  Finally, plaintiff was informed of his rights to appeal the FBI's

determination to OIP within sixty (60) days from the date of the letter.  *(See* **Exhibit F.)**

(13)   By letter dated October 29, 2013, plaintiff appealed the FBI's no record main file

---

[3]  The FBI combined plaintiff's August 20, 2013, and August 28, 2013 FOIPA request letters into a single
administrative case; FOIPA Request Number 1228440-000.

determination to the OIP. *(See* **Exhibit G.)**

(14)     In a letter dated November 13, 2013, OIP acknowledged receipt of plaintiff's

appeal assigning case number AP-2014-00436.  OIP advised plaintiff it would notify him of its

decision as soon as possible. *(See* **Exhibit H.)**

(15)     In a letter dated December 13, 2013, OIP advised plaintiff it was affirming the

FBI's action concerning his FOIPA request.  OIP determined the FBI's response was considered

correct as it conducted an adequate and reasonable search for responsive records in response to

his request.  Finally, OIP advised plaintiff of his rights to file a lawsuit in federal court if he was

dissatisfied with its determination, or he could accept mediation services offered by the Office of

Government Information Services ("OGIS") to resolve FOIA disputes between requesters and

Federal agencies as a non-exclusive alternate to litigation. *(See* **Exhibit I.)**

(16)     The plaintiff filed the instant Complaint with this Court on April 28, 2015. *See*

ECF No. 1, Complaint for Injunctive Relief.

(17)     By letter dated August 12, 2015, the FBI made a release of records to plaintiff.

The FBI advised plaintiff  2 pages of responsive records were reviewed and 2 pages were being

released in part, with certain information withheld in part or in full pursuant to Privacy Act

Exemption (j)(2) and FOIA Exemptions (b)(6), and (b)(7)(C).  Plaintiff was informed another

search for both, main files and "cross-reference" entries was conducted at the litigation stage.[4]

This search located the enclosed processed responsive "cross-reference." *(See* **Exhibit J.)**

---

[4] It is the FBI's policy to search only for main files at the administrative stages of most FOIA request.  The
FBI, however, will expand the search to include cross-reference files in the litigation stage.

## THE FBI'S RECORDS SYSTEMS

### *Central Record System ("CRS")*

(18)    The Central Records System ("CRS") is an extensive system of records consisting

of applicant, investigative, intelligence, personnel, administrative, and general files compiled and

maintained by the FBI in the course of fulfilling its integrated missions and functions as a law

enforcement, counterterrorism, and intelligence agency to include performance of administrative

and personnel functions.  The CRS spans the entire FBI organization and encompasses the records

of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices ("Legats")

worldwide.

(19)    The CRS consists of a numerical sequence of files, called FBI "classifications,"

which are organized according to designated subject categories.  The broad array of CRS file

classification categories include types of criminal conduct and investigations conducted by the

FBI, as well as categorical subjects pertaining to counterterrorism, intelligence,

counterintelligence, personnel, and administrative matters.  For identification and retrieval

purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number

("UCFN") consisting of three sequential components:  (a) the CRS file classification number, (b)

the abbreviation of the FBI Office of Origin ("OO") initiating the file, and (c) the assigned

individual case file number for that particular subject matter.[5]  Within each case file, pertinent

documents of interest are "serialized," or assigned a document number in the order which the

document is added to the file, typically in chronological order.

---

[5] For example, in a fictitious file number of "11Z-HQ-56789;" the "11Z" component indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI OO of the file, and "56789"is the assigned case specific file number.

### CRS General Indices and Indexing

(20)    The general indices to the CRS are the index or "key" to locating records within

the enormous amount of information contained in the CRS.  The CRS is indexed in a manner that

meets the FBI's investigative needs and priorities, and allows FBI personnel to reasonably and

adequately locate pertinent files in the performance of their law enforcement duties.  The general

indices are arranged in alphabetical order and comprise an index on a variety of subject matters to

include individuals, organizations, events, or other subjects of investigative interest that are

indexed for future retrieval.  The entries in the general indices fall into two category types:

    a.  Main entry.  This entry pertains to records indexed to the main subject(s) of a file,
known as "main file" records.  The "main" entry carries the name of an
individual, organization, or other subject matter that is the designated subject of
the file.

    b.  Reference entry.  This entry, or a "cross-reference," pertains to records that
merely mention or reference an individual, organization, or other subject matter
that is contained in a "main" file record about a different subject matter.

(21)    FBI employees may index information in the CRS by individual (persons), by

organization (organizational entities, places, and things), and by event (*e.g.,* a terrorist attack or

bank robbery).  Indexing information in the CRS is based on operational necessity, and the FBI

only indexes that information considered relevant and necessary for future retrieval.  Accordingly,

the FBI does not index every individual name or other subject matter in the general indices.

### Automated Case Support ("ACS") System

(22)    Automated Case Support ("ACS") is an electronic, integrated case management

system that became effective for FBIHQ and all FBI Field Offices and Legats on October 1, 1995.

As part of the ACS implementation process, over 105 million CRS records were converted from

automated systems previously utilized by the FBI into a single, consolidated case management

system accessible by all FBI offices.  ACS has an operational purpose and design to enable the

FBI to locate, retrieve, and maintain information in its files in the performance of its myriad missions and functions.[6]

(23)     The Universal Index ("UNI") is the automated index of the CRS and provides all offices of the FBI a centralized, electronic means of indexing pertinent investigative information to FBI files for future retrieval via index searching.  Individual names may be recorded with applicable identifying information such as date of birth, race, sex, locality, Social Security Number, address, and/or date of an event.  Moreover, ACS implementation built upon and incorporated prior automated FBI indices; therefore, a search employing the UNI application of ACS encompasses data that was already indexed into the prior automated systems superseded by ACS.  As such, a UNI index search in ACS is capable of locating FBI records created before its 1995 FBI-wide implementation to the present day in both paper and electronic format.[7] Currently, UNI consists of approximately 111 million searchable records and is updated daily with newly indexed material.

### ACS and Sentinel

(24)     Sentinel is the FBI's next generation case management system that became effective FBI-wide on July 1, 2012.  Sentinel provides a web-based interface to FBI users, and it includes the same automated applications that are utilized in ACS.  After July 1, 2012, all FBI generated records are created electronically in case files via Sentinel; however, Sentinel did not replace ACS and its relevance as an important FBI search mechanism.  Just as pertinent

---

[6] ACS and the next generation Sentinel system are relied upon by the FBI daily to fulfill essential functions such as conducting criminal, counterterrorism, and national security investigations; background investigations; citizenship and employment queries, and security screening, to include Presidential protection.

[7] Older CRS records that were not indexed into UNI as a result of the 1995 ACS consolidation remain searchable by manual review of index cards, known as the "manual indices."  A search of the manual indices is triggered for requests on individuals if the person was born on or before January 1, 1958; and for requests seeking information about organizations or events on or before January 1, 1973.  Plaintiff's requests for records from "March 2010 to Present" and "January 1, 2010 to Present" would have been created after these dates, so potentially responsive records would be captured through a UNI search.

information was indexed into UNI for records generated in ACS before July 1, 2012, when a

record is generated in Sentinel, information is indexed for future retrieval.  Moreover, there is an

index data sharing nexus between the Sentinel and ACS systems whereby components of

information indexed into Sentinel are also replicated or "backfilled" into ACS.  In sum, the

Sentinel case management system builds on ACS and shares its operational purpose; Sentinel

provides another portal to locate information within the vast CRS for FBI records generated on or

after July 1, 2012.

## SEARCH PROCEDURES

### *Index Searching*

(25)    To locate CRS information, the FBI employs an index search methodology.  Index

searches of the CRS are reasonably expected to locate responsive material within the vast CRS

since the FBI indexes pertinent information into the CRS to facilitate retrieval based on

operational necessity.  Given the broad range of indexed material in terms of both time frame and

subject matter that it can locate in FBI files, the automated UNI application of ACS is the

mechanism RIDS employs to conduct CRS index searches.  If a request seeks records that may

have been generated on or after July 1, 2012, an overlapping search of ACS via the UNI

application and a Sentinel index search are performed at the litigation stage to ensure adequacy of

the CRS index search.

## SEARCHES FOR RESPONSIVE RECORDS

### *Administrative Stage CRS Search Results*

(26)    In response to plaintiff's perfected August 20, 2013, and August 28, 2013, FOIPA

requests, the FBI conducted a CRS index search on October 3, 2013, for responsive main file

records employing the UNI application of ACS.  Plaintiff requested records relating to plaintiff's

federal criminal case number 1:11-CR-00715-001, <u>United States of America v. Robert L.</u>

<u>Hedrick</u>; all FBI case file numbers related to plaintiff and certain third party individuals for

United States District Court, Southern District of Texas, Brownsville Division, case Doc. No.

1:12-CR-00506-001; all information (notes, reports, evaluations) related to plaintiff's case located

at the Cameron County Sheriff's Department/FBI joint investigation, to include complaints filed

by plaintiff against a third party individual, an interview between plaintiff and two FBI field

agents in August 2012, information regarding Dyna Corp in Ft. Worth, TX as it relates to this

interview, all information regarding a Colombian individual known as "The Colonel" as it relates

to this interview; any and all correspondence between any FBI agent or employee or contractor in

relation to plaintiff and a certain Homeland Security Agent, several U.S. Attorney's, United States

District Court Judge Andrew S. Hanen, and any employee of the United States Marshal Service;

all information from an investigation by the FBI-South Texas Corruption Task Force as it relates

to plaintiff, including records prepared by several FBI Special Agents; and finally, all information

related to plaintiff at any level of the FBI.  Both of plaintiff's FOIPA request letters (<u>See</u> Exhibits

A-B) requested specific records relating to, or pertaining to, plaintiff himself.  The FBI searched

the CRS utilizing a three-way phonetic breakdown of plaintiff's name.  Specifically the FBI

search: "Hedrick, Robert, Lynn," "Hedrick, Robert, L.," "Hedrick, R., L.," "Hedrick, Robert,"

"Hedrick, R.," "Hedrick, Lynn" and "Hedrick, L."[8]  The FBI used plaintiff's date of birth, social

security number, and place of birth to facilitate the identification of responsive records (<i>i.e.,</i> to

---

[8]   With this type of search, the computer automatically breaks a name down and searches the index for three different combinations of the first and last names entered.  The phonetic aspect of the search means that names are also broken down based on their phonetic characteristics.  The computer will return results based on whether or not they phonetically match a certain percentage of the first and last name searched.  ACS's default phonetic match setting for first and last names is 80%.  Thus, with regard to this search, the computer returned results that were an 80% or greater phonetic match to the three-way breakdowns of the names RIDS searched in ACS.

ensure that any possible hits on the search terms were actually about plaintiff).  As a result of this

search, the FBI located no main files responsive to the subject of plaintiff's request.

### *Additional ACS and Sentinel Search Results*

(27)    At the litigation stage, the FBI conducted an additional search on July 13, 2015, for

both main file and cross-references[9] potentially responsive to plaintiff's request using the same

search parameters it used in the original search.  The search included both a CRS index search

employing the UNI application of ACS and an overlapping Sentinel index search utilizing a three-

way phonetic breakdown of plaintiff's name: "Hedrick, Robert, Lynn," "Hedrick, Robert, L.,"

"Hedrick, R., L.," "Hedrick, Robert," "Hedrick, R.," "Hedrick, Lynn" and "Hedrick, L."  The FBI

also used plaintiff's date of birth, social security number, and place of birth to facilitate the

identification of responsive records.  As a result of these search efforts, the FBI again did not

identify any main file records indexed to the plaintiff; however, it located a responsive cross-

reference control file number 804B-SA-C57921-H, Serial 123.

(28)    For identification and retrieval purposes across the FBI, when a case file or control

file is opened, it is assigned a Universal Case File Number ("UCFN") consisting of three

sequential components:  (a) the CRS file classification number, (b) the abbreviation of the FBI

Office of Origin ("OO") initiating the file, and (c) the assigned individual case file number for

that particular subject matter.  For example, for control file number "804B-SA-C57921-H-123;"

the "804B" component indicates the file classification, "SA" indicates the FBI San Antonio Field

Office ("FBI SA") is the FBI OO of the file, and "C56789-H" is the assigned case specific control

---

[9] A main file entry pertains to a record indexed to the main subject of a file, known as "main file" records.
A cross-reference entry pertains to records that merely mention or reference an individual, organization, or other
subject matter that is contained in a "main" file record about a different subject matter.

file number.[10]  Within each case file, pertinent documents of interest are "serialized," or assigned

a document number, in the order which the document is added to the file, typically in

chronological order.  Plaintiff's responsive serial was serialized at location "-123" of this field

office control file.

(29)     The responsive record released to plaintiff is an FBI "302" Interview Form

compiled as a result of plaintiff's interview by FBI Special Agents at his Brownsville, Texas, Pan

American Airways, Inc., office on March 28, 2011.  Unlike an investigative case file which

contains records generated in the course of a specific investigation, the control file in which the

responsive record released to plaintiff was located is a repository of potential investigative leads

of alleged federal criminal violations that may or may not lead to the opening of a preliminary or

full investigation.  A control file can be used over and over as a holding place for various types of

potential investigate leads associated with numerous individuals and/or entities which may have

no connection to each other.  The FBI's search efforts did not locate any additional documents in

this control file that were responsive to plaintiff's request.

### *Request to Search Locations Other than the CRS*

(30)     Plaintiff requested the FBI to "review your SYSTEM OF RECORDS for the

requested information" for both of his requests.  In addition, in the August 28, 2013, plaintiff

requested the FBI to search: *"All information located anywhere within the Federal Bureau of*

*Investigation; at any office, including, but not limited to the following offices: A. FBI, 2305*

*Hudson Blvd., Brownsville, TX 78526; B. Any other Brownsville offices; C. FBI-South Texas*

*Corruption Task Force (at any location) specifically at offices in Brownsville, San Antonio and*

*Corpus Christi, Texas; D. Houston, Texas; E. Sacramento, California; F. Sanfranciso*[sic]*,*

---

[10]  The letter "C" in control file number 804B-SA-C57921 is the FBI's internal case file management
designation that it is a control file.

*California; and G. Headquarters Washington DC.*" Given the nature of plaintiff's request

seeking specific records relating to, or pertaining to, himself, and the comprehensive nature of the

information contained in the CRS (*See Supra* ¶ 18), the CRS is the only FBI system of records

where responsive records would reasonably be found.  Investigative records created by FBI SAs

and support employees are indexed into the CRS, or as of July 1, 2012, Sentinel.  In addition,

there is an index data sharing nexus between the Sentinel and ACS systems whereby components

of information indexed into Sentinel are also replicated or "backfilled" into ACS.  The FBI search

policy is grounded on the principle of reasonableness, not mere possibility.  As applicable here,

plaintiff provided no information for the FBI to reasonably conclude that records would reside

outside the CRS.  Moreover, there is no indication from the information located as the result of

the CRS index search that responsive material would reside in any other FBI system or location;

therefore, there is no basis for the FBI to conclude a search elsewhere could reasonably be

expected to locate responsive material and would thus be unduly burdensome in nature.

### Scope of Searches

(31)    In summary, the FBI conducted several searches reasonably calculated to locate

records responsive to plaintiff's request.  Because plaintiff sought investigative records, the FBI

searched its CRS, the system in which the FBI maintains its investigative files and indexes for

future retrieval information about individuals, organizations, events, and other subjects of

investigative interest.  Given its comprehensive scope and nature, this is the principal records

system searched by the FBI in response to requests for investigative records and the FBI

concluded here that it was the only system reasonably likely to contain the information sought by

plaintiff.

16

## JUSTIFICATION FOR NON-DISCLOSURE UNDER THE PRIVACY ACT

(32)    When an individual requests records about himself from the FBI, the long-settled

RIDS process is to first consider the request under the Privacy Act, which generally provides

individuals a right of access to records about them maintained in government files, unless the

records are part of a system of records exempted from individual access. *See* 5 U.S.C. § 552a(d).

Of relevance here, agencies are permitted to exempt from mandatory disclosure any systems of

records "maintained by an agency or component thereof which performs as its principal function

any activity pertaining to the enforcement of criminal laws, including police efforts to prevent,

control, or reduce crime or to apprehend criminals . . . ." 5 U.S.C. § 552a(j)(2).

(33)    DOJ has promulgated regulations pursuant to 5 U.S.C. §§ 552a(d) and (j) that

exempt certain systems of records from the individual access provisions of the Privacy Act.  In

particular, DOJ has exempted FBI law enforcement investigative records maintained in the CRS

from the Privacy Act's access provision pursuant to (j)(2).[11] *See* 28 C.F.R. § 16.96(a)(1).

(34)    Here, in response to plaintiff's request, the FBI located a record compiled as a

result of an interview of plaintiff by FBI Special Agents at his Brownsville, Texas, Pan American

Airways, Inc., office on March 28, 2011.  The law enforcement record at issue was retrieved by

the FBI through a search of the CRS, a system of records specifically exempt from the access

provisions of the Privacy Act pursuant to 5 U.S.C. § 552a(j)(2), as implemented by 28 C.F.R. §

16.96(a)(1).  Consequently, the Privacy Act does not provide plaintiff an avenue for accessing this

record.  However, the FBI does not end its analysis of a first-party records request with the

Privacy Act.  Instead, once it determines that access to the records is not available under the

Privacy Act, the FBI then processes the records under the FOIA to achieve maximum disclosure.

---

[11] *See* Privacy Act System of Records FBI-002, 63 FR 8671 (1998) (last publication of complete notice).

As a result, the records identified as exempt under Privacy Act Exemption (j)(2) were processed and released to Plaintiff subject only to the FOIA exemptions noted.  None of the information exempt from disclosure under the Privacy Act has been withheld from Plaintiff unless it was withheld under a FOIA exemption

## JUSTIFICATION FOR NON-DISCLOSURE UNDER THE FOIA

(35)    The document responsive to plaintiff's request was processed to achieve maximum disclosure consistent with the access provisions of the FOIA.  Every effort was made to provide plaintiff with all material in the public domain and with all reasonably segregable, non-exempt information in the responsive records.  No reasonably segregable, nonexempt portions have been withheld from plaintiff.  Further description of the information withheld, beyond what is provided in this declaration, could reveal the actual exempt information that the FBI has protected.  Copies of the pages released in part have been consecutively numbered "Hedrick-1 through Hedrick-2" at the bottom of each page.  The FBI provided a copy of the Bates-numbered pages that were withheld in part to plaintiff by letter dated August 12, 2015.  *(See* **Exhibit J.**)  As reflected on the records, the FBI withheld information in the two page document in part pursuant to FOIA Exemptions 6, and 7(C).  *See* 5 U.S.C. §§ 552 (b)(6), and (b)(7)(C).  *(See* **Exhibit K.**)

### *Explanation of the Coded Format Used to Describe and Justify Withholdings*

(36)    This Bates-numbered document contains, on its face, coded categories of exemptions that indicate the nature of the information withheld pursuant to the provisions of the FOIA.  The coded categories are provided to aid the Court and plaintiff's reviews of the FBI's explanations of the FOIA exemptions it has asserted to withhold the material.  The coded, Bates-numbered pages, together with this declaration demonstrate that all material withheld by the FBI is exempt from disclosure pursuant to the cited FOIA exemptions.

(37)   Each instance of information withheld on the Bates-numbered document is accompanied by a coded designation that corresponds to the categories listed below. For example, if "(b)(7)(C)-1" appears on a document, the "(b)(7)(C)" designation refers to FOIA Exemption 7(C) protecting against unwarranted invasions of personal privacy. The numerical designation of "1" following the "(b)(7)(C)" narrows the main category into the more specific subcategory, of "Names and/or Identifying Information of Third Parties Merely Mentioned."

(38)   Listed below are the two categories used to explain the FOIA exemptions asserted to withhold the protected material:

| SUMMARY OF FBI JUSTIFICATION CATEGORIES | |
| --- | --- |
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Category (b)(6) and (b)(7)(C)** | **CLEARLY UNWARRANTED INVASION OF PRIVACY AND UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| (b)(6)-1 and (b)(7)(C)-1 | Names and/or Identifying Information of Third Parties Merely Mentioned |
| (b)(6)-2 and (b)(7)(C)-2 | Names and/or Identifying Information of FBI Special Agents |

### *Exemption (b)(7) Threshold*

(39)   The FBI applied Exemption (b)(7)(C) to protect information in this case. As a threshold matter, an agency must first demonstrate that the records or information at issue were compiled for law enforcement purposes before it can apply these or any other subparts of Exemption (b)(7).

(40)   The FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency; to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security; and to further the foreign intelligence objectives of

the United States. *See* 28 U.S.C. §§ 533 and 534; Executive Order 12,333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM"); and 28 C.F.R. § 0.85. Under these investigative authorities and in furtherance of its law enforcement mandate, the FBI compiled this record as a result of an interview with plaintiff at his Brownsville, Texas, Pan American Airways, Inc., office on March 28, 2011. The intelligence was collected for future analysis of potential criminal activities, including potential acts of public corruption, as detailed by plaintiff.

(41)     Thus, this record was compiled for a law enforcement purpose that is squarely within the law enforcement responsibility and authority of the FBI. Therefore, the information readily meets the threshold requirement of Exemption (b)(7).

### *Exemptions (b)(6) and (b)(7)(C) – Invasions of Personal Privacy*

(42)     FOIA Exemption (b)(6) exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). All information that applies to a particular person falls within the scope of Exemption 6.

(43)     FOIA Exemption (b)(7)(C) similarly exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[12]

(44)     When withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any

---

[12] The practice of the FBI is to assert Exemption (b)(6) in conjunction with Exemption (b)(7)(C). Although the balancing test for Exemption (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The privacy interests are balanced against the public's interest in disclosure under both exemptions.

public interest in disclosure of information about these individuals.  In asserting these exemptions, each piece of information was scrutinized to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information appears in the documents at issue.  When withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure.  For purposes of these exemptions, a public interest exists only when information about an individual would shed light on the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to other law enforcement agencies and partners.  In each instance where information was withheld pursuant to Exemptions (b)(6) and (b)(7)(C), the FBI determined that the individuals' privacy interests outweighed any public interest in disclosure.

### (b)(6)-1        Third Parties Merely Mentioned In the Records
### (b)(7)(C)-1

(45)     In Categories (b)(6)-1 and (b)(7)(C)-1, the FBI protected the names of and identifying information about third parties who were merely mentioned in the record responsive to plaintiff's request, such as individuals claimed by plaintiff as receiving kickbacks for illicit activities.  These third parties have substantial personal privacy interests in not having their identities and identifying information disclosed to the public because such disclosure would show that these third parties were connected in some way with a possible FBI criminal investigation.  Being connected to an FBI investigation can carry an extremely negative connotation.  Disclosure of their identities would subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them.  Accordingly, the FBI has determined that these third parties have substantial privacy interests in not having their information disclosed.

(46)     The FBI then considered whether disclosure of their information would

21

significantly increase the public's understanding of the FBI's operations and activities. As these

individuals' information appears in the FBI file essentially by happenstance, no public interest

would be served by its disclosure. Accordingly, the FBI concluded that these individuals'

substantial privacy interests outweighed a non-existent public interest, and that disclosure would

unwarrantedly invade those privacy interests. Consequently, the FBI protected these individuals'

information pursuant to FOIA Exemptions (b)(6)-1 and (b)(7)(C)-1.[13]

### (b)(6)-2        FBI Special Agents
### (b)(7)(C)-2

(47)     In Categories (b)(6)-2 and (b)(7)(C)-2, the FBI protected the names and identifying

information of FBI Special Agents ("SAs") who were responsible for conducting, supervising,

and/or maintaining the investigative activities reflected in the document responsive to plaintiff's

FOIPA request. SAs responsibilities may include conducting interviews and compiling

information, coordinating with other law enforcement agencies (both foreign and domestic), as

well as reporting on the status of the investigation and documenting investigative

accomplishments. In this case, the FBI SAs collected intelligence from plaintiff for future

analysis of potential criminal activities as detailed by plaintiff. No further investigative records

were compiled in relation to plaintiff's allegations.

(48)     With respect to FBI SAs, they do not choose their assignments to any particular

investigation. Publicity (adverse or otherwise) regarding any particular investigation to which

they have been assigned may seriously prejudice their effectiveness in conducting other

investigations. FBI SAs, as individuals, also have privacy interests in being protected from

unnecessary, unofficial questioning as to the conduct of this or other investigations, whether or

---

[13] The FBI asserted Categories (b)(6)-1 and (b)(7)(C)-1 on Bates pages Hedrick 1-2.

not they are currently employed by the FBI. They conduct official inquiries into various criminal

and national security violation cases. They come into contact with all strata of society,

conducting searches and making arrests, both of which result in reasonable but nonetheless

serious disturbances to people and their lives. It is possible for an individual targeted by such law

enforcement actions to carry a grudge that may last for years. These individuals may seek

revenge on the agents and other federal employees involved in a particular investigation. The

publicity associated with the release of an agent's identity in connection with a particular

investigation or inquiry could trigger hostility toward a particular agent. Thus, FBI SAs maintain

substantial privacy interests in information about them in criminal and national security

investigative case files. This substantial privacy interest is not diminished even if the agents were

required to testify at related trials.

(49)     After determining that these employees have substantial privacy interests, the FBI

then considered whether there was any public interest in disclosing their information. The FBI

concluded that no such public interest existed because disclosure of these employees' identities

and information would not, themselves, significantly increase the public's understanding of the

FBI's operations and activities.

(50)     Accordingly, after conducting the privacy/public interest balancing test, the FBI

concluded that its employees' substantial privacy interests outweighed a non-existent public

interest, and thus protected their information pursuant to FOIA Exemptions (b)(6)-2 and

(b)(7)(C)-2.[14]

## SEGREGABILITY

(51)     As discussed previously, the FBI identified and processed two pages of responsive

_____

[14]   The FBI cited Categories (b)(6)-2 and (b)(7)(C)-2 on Bates page Hedrick-1.

records in this case.  These two pages were released in part ("RIP") with redactions pursuant to

the specific FOIA exemptions identified on these pages, and described herein.  These pages

comprise a mixture of material that could be segregated for release and material that was withheld

because release would trigger foreseeable harm to one or more interests protected by the cited

FOIA exemptions on these pages.

## CONCLUSION

(52)    The FBI performed searches of its CRS reasonably calculated to locate responsive

records, and there are no other records systems or locations that may contain records responsive

to plaintiff's request.

(53)    The FBI properly denied access to this record under the Privacy Act pursuant to

Privacy Act Exemption (j)(2), 5 U.S.C. § 552a(j)(2).

(54)    However, it then processed all responsive records subject to the FOIA and released

all reasonably segregable non-exempt information from this record to plaintiff.  The FBI properly

protected exempt information in these records pursuant to FOIA Exemptions 6, and 7(C).

(55)    In determining whether to withhold information, the FBI carefully examined the

responsive records and withheld information that, if disclosed: would cause a clearly unwarranted

invasion of personal privacy, or could reasonably be expected to constitute an unwarranted

invasion of personal privacy.  After review of the responsive record in this case, I have

determined that there is no further non-exempt information that can be reasonably segregated and

released without revealing exempt information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct, and that Exhibits A through K attached hereto are true and correct copies.

Executed this 24th day of September, 2015.


DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia